**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STEPHEN M. KENNEDY and ALICIA J. CARSON, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT SPEER, Acting Secretary of the Army,<br><br>*Defendant*. | No. 3:16-cv-2010-WWE<br><br>April 17, 2017 |

## AMENDED COMPLAINT

Since the September 11, 2001 terrorist attacks, nearly two million young men and women have volunteered to join the United States Army and have deployed, often multiple times, to Iraq and Afghanistan to fight for our country. Thousands were killed or maimed, and hundreds of thousands more suffer from the invisible wounds of war. The Army routinely fails to treat these soldiers' serious mental health conditions and instead gives them less-than-Honorable discharges, often because of infractions related to mental health crises. As a result, these veterans lose access to the very services and benefits they need to heal their wounds and thrive in civilian life. Even worse, the Army—through the Army Discharge Review Board ("ADRB"), created by Congress to correct improper and unjust discharges—betrays these veterans yet again by wrongfully denying their applications for discharge upgrades. Steve Kennedy and Alicia Carson bring this class action on behalf of these veterans who continue to be unlawfully denied discharge upgrades that would accurately reflect their honorable service to the nation.

Steve Kennedy served his country with distinction in the United States Army from 2006 until 2009, leading several teams despite his junior rank, training new soldiers, and fighting valiantly in Iraq in 2007 and 2008. Like many others, Mr. Kennedy returned from Iraq with severe PTSD and major depression, which the Army did not adequately diagnose or treat. Mr. Kennedy continued to lead his team to top performance marks but began abusing alcohol, self-isolating, and self-injuring, which ultimately led to him going absent without leave for two weeks. Upon Mr. Kennedy's return, his command ordered him to be psychiatrically evaluated, where the Army clinician diagnosed him with major depressive disorder, with no mention of the possibility of PTSD despite the two diagnoses' many overlapping symptoms. The Army subsequently discharged him with a General discharge based on his absence without leave.

Alicia Carson deployed to Afghanistan with the Army in early 2010. Within five months, her command promoted her from Assistant Gunner to Gunner and recommended her for placement with a Special Forces unit. As the only woman in her Special Forces unit, Ms. Carson took part in over 100 missions in fewer than 300 days and served in combat on a regular basis, despite the Army's official prohibition against women serving in combat roles. Upon Ms. Carson's return to the United States, clinicians from the Department of Defense and Department of Veterans Affairs both diagnosed Ms. Carson with PTSD and traumatic brain injury, and she obtained a doctor's note to be excused from National Guard drills. Despite Ms. Carson's doctor's note and accepted medical excuse for missing drills, the National Guard discharged her with a General discharge because of her absences.

Both Mr. Kennedy and Ms. Carson applied to the ADRB to request that their discharge statuses be upgraded to Honorable. The ADRB denied both Mr. Kennedy's and Ms. Carson's applications, as it has done for many other veterans in similar situations, even though their

applications provided clear evidence showing that their service-connected PTSD and related conditions mitigated their misconduct and despite the issuance in 2014 by Secretary of Defense Chuck Hagel of binding instructions directing records-correction boards to give "liberal consideration" to PTSD diagnoses and to Service treatment records indicating one or more symptoms of PTSD or related conditions at the time of discharge.

The ADRB's decisions are arbitrary, capricious, unsupported by the evidence, and contrary to the Army's own rules, in violation of the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment. On behalf of themselves and others similarly situated, Mr. Kennedy and Ms. Carson ask the Court to set aside and hold unlawful these decisions and grant their discharge upgrade applications so that their records may finally reflect the true character of their service.

## JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. § 1331. This action arises under the Administrative Procedure Act, 5 U.S.C. § 706, and the Due Process Clause of the Fifth Amendment.

2. Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1)(C). Plaintiff Stephen Kennedy resides in the District of Connecticut, no real property is involved in the action, and Defendant Robert Speer is sued in his official capacity as an officer of the United States.

## PARTIES

3. Stephen Kennedy is a Connecticut resident and veteran of the U.S. Army.

4. Alicia Carson is a former Connecticut resident and veteran of the U.S. Army and the Connecticut Army National Guard. She presently resides in Alaska.

5. Defendant Robert Speer, Acting Secretary of the Army, is sued in his official capacity. Congress has authorized the Secretary of the Army, acting through the ADRB, to

correct the improper or inequitable discharge of any former member of the Army. 10 U.S.C. § 1553(a) (2012); 32 C.F.R. § 70.9 (1978).

## REGULATORY BACKGROUND

6. Upon discharge, military personnel receive a certificate that characterizes their service as Honorable, General (Under Honorable Conditions), Other than Honorable, Bad Conduct, or Dishonorable. 32 C.F.R. §§ 724.109, 724.111.

7. A veteran's discharge characterization affects their eligibility for various benefits and support services administered by the U.S. Department of Veterans Affairs ("VA"), *see, e.g.*, 38 U.S.C. § 101(2); 38 C.F.R. § 3.12, as well as those benefits and services provided by state laws.

8. To receive VA education benefits and services through the Post-9/11 GI Bill program, a veteran must be discharged from service with an Honorable discharge or be discharged or released for a service-connected disability. 38 U.S.C. § 3311(b)-(c).

9. A veteran applying for a discharge upgrade at the ADRB has a right to two types of reviews: a documentary records review and a personal appearance hearing. 32 C.F.R. § 70.8(b)(3).

10. The ADRB reviews discharges for propriety and equity. 32 C.F.R. § 70.9.

11. On September 3, 2014, then-Secretary of Defense Chuck Hagel directed all records-correction boards to give "special consideration" to PTSD diagnoses by the VA and "liberal consideration" to diagnoses of PTSD by civilian providers when adjudicating discharge upgrade applications submitted by veterans. Ex. 1, Memorandum from Chuck Hagel, Secretary of Defense (Sept. 3, 2014) ("Hagel Memo").

12. The Hagel Memo also directs military boards to consider PTSD and "PTSD-related conditions" as "potential mitigating factors in the misconduct that caused the under other than honorable conditions characterization of service." *Id.*

13. As the ADRB has recognized, the Hagel Memo is binding upon its adjudications of veterans' discharge upgrade claims. *See, e.g.*, ADRB Decision No. AR20150012549, Sept. 28, 2016, boards.law.af.mil/ARMY/DRB/CY2015/AR20150012549.txt; ADRB Decision No. AR20150017587, May 9, 2016, http://boards.law.af.mil/ARMY/DRB/CY2015/AR20150017587.txt.

14. The ADRB must respond to all issues relevant to the decision of whether there should be a change in the character of or reason for discharge. 32 C.F.R. § 70.8(d); DoD Instruction 1332.28, Discharge Review Board Procedures and Standards (Apr. 4, 2004).

15. When the ADRB makes a factual determination after considering contradictory evidence in the record, it must explain in its decision "why the information relied upon was more persuasive than the information that was rejected." *Id.*

16. The authorizing statute, 10 U.S.C. § 1553, also authorizes the creation of Boards for Correction of Military Records, which may also revise military documents. However, the statute does not require a veteran to apply to both boards prior to seeking judicial review, nor does it establish any sort of internal appeals process. *Id*.

17. Federal courts may review ADRB decisions as final agency actions under the Administrative Procedure Act. 5 U.S.C. § 706.

18. The Army and other administrative agencies are responsible for maintaining records for a variety of official purposes, including judicial review of agency action. 5 U.S.C § 552a(e)(5); 44 U.S.C. §§ 3101, 3301.

## FACTS AND PROCEEDINGS

### Allegations as to Class Representative Stephen Kennedy

19. Mr. Kennedy was born in 1986 and grew up in Monroe, Connecticut. He resides in Fairfield, Connecticut, with his wife and two children.

20. Mr. Kennedy is active in veterans' organizations. He is the founder and team leader of the Connecticut Chapter of Iraq and Afghanistan Veterans of America.

21. Mr. Kennedy joined the Army in May 2006. As Iraq descended into civil conflict and the war in Afghanistan dragged on, he enlisted with the hope of being able to make an immediate positive difference in the world.

22. Mr. Kennedy completed basic training at Ft. Benning, Georgia, and was initially stationed at Ft. Bragg, North Carolina.

23. He served in the Airborne Infantry, MOS 11B1P, in A Company of the 2nd Battalion, 504th Parachute Infantry Regiment in the 82nd Airborne Division.

24. Mr. Kennedy was deployed to Iraq from June 2007 to July 2008, during which time he served as a Humvee turret gunner and machine gun operator.

25. During the first part of his deployment, Mr. Kennedy's unit provided route clearance and security for a supply convoy between western and central Iraq, an area where improvised explosive devices ("IEDs") were common. In the first months of the mission, his unit's convoys hit or discovered IEDs approximately every other week.

26. From March to July of 2008, Mr. Kennedy's unit was responsible for disrupting Al Qaeda supply lines through the desert villages of Anbar and Saladin Provinces. His unit was engaged in several firefights with Al Qaeda combatants, two of which ended with an insurgent detonating a suicide vest.

27. Early in his deployment, Mr. Kennedy received an Army Achievement Medal for taking over leadership when his team leader went on leave, training new soldiers and leading his team to the highest-rated training performance in his company, all while he was still only a Private First Class.

28. While Mr. Kennedy was deployed in Iraq, the Army promoted him early to Specialist and appointed him team leader of a newly created machine gun team. He led his team on hundreds of successful missions.

29. For his continuing exceptional service, at the end of his deployment to Iraq, Mr. Kennedy was awarded the Army Commendation Medal, which is awarded to service members who distinguish themselves by heroism, meritorious achievement, or service.

30. For his combat service, Mr. Kennedy was awarded the Combat Infantryman Badge, which is awarded to infantrymen of rank Colonel and below who personally fought in active ground combat.

31. In addition, Mr. Kennedy and his unit received National Defense Service Medals, Global War on Terrorism Service Medals, Iraq Campaign Medals, and Overseas Service Ribbons.

32. Upon Mr. Kennedy's return to Fort Bragg, he expanded his record of excellence. He continued to serve as a team leader, and his command asked him to temporarily step in for another team leader. He led both teams to some of the highest performance ratings in the battalion. His Platoon Sergeant recommended Mr. Kennedy for promotion to Sergeant as soon as he was eligible, with the full support of his First Sergeant.

33. Although Mr. Kennedy continued to thrive as a leader, his PTSD symptoms began to emerge after he returned from deployment. He began to self-isolate, had trouble sleeping,

avoided stressful situations, and suffered from "survivor's guilt" and depression. He had no sense of a future, feeling as if he was still waiting for the IED that should have killed him in Iraq. He started to drink heavily, abusing alcohol to soothe his PTSD symptoms.

34. During this time, Mr. Kennedy began to physically harm himself. On several occasions, he walked around Fayetteville late at night, hoping to be mugged or attacked.

35. He also started to self-mutilate, cutting his hands but making up stories so that his injuries would appear to be the results of accidents. Planning the cutting incidents was therapeutic for him. Orchestrating the cover-up and working up the nerve to hurt himself distracted him from his intrusive memories.

36. As his condition worsened, Mr. Kennedy began having suicidal thoughts.

37. After his deployment, Mr. Kennedy was also having serious relationship and financial difficulties. He tried to conceal his troubles and would self-medicate to avoid the stress of dealing with his hardship. Such avoidant behavior is a common symptom of PTSD.

38. As part of his effort to mask his growing personal and mental health difficulties, Mr. Kennedy devoted himself to working hard and maintaining his good performance in the Army. It took enormous mental energy to do this, and at the end of each day, he was burned out. After work, he would drink or smoke on his back porch with a friend who was having similar difficulties.

39. Mr. Kennedy did not seek help for his mental health struggles because he feared being labeled weak and losing the trust of members of his unit. He had observed how leadership made targets out of the few soldiers who sought mental health treatment, encouraging junior enlisted soldiers to avoid and not trust those who did obtain assistance.

40. By March 2009, Mr. Kennedy's mental health issues had grown dire without treatment. Around this time his leadership told him that he would be denied leave to attend his own wedding.

41. Mr. Kennedy had informed his squad leader about his need to go on leave for his wedding a year prior and had been informally approved at that time. His command did not tell him he needed to complete additional paperwork until they notified him shortly before a training exercise that would prevent him from taking leave for his wedding.

42. Mr. Kennedy feared that he would either lose his wife if he did not return for his wedding or be denied leave if he confronted his leadership. His mental health condition made it impossible for him to resolve this conflict, and he instead responded by injuring himself and contemplating suicide. Concluding that his unit did not care about him and would not miss him, he went absent without leave ("AWOL") to attend his wedding.

43. Upon his return to the base, Mr. Kennedy's company commander sent him to see a psychologist because going AWOL was uncharacteristic for him. After a twenty-minute examination, the psychologist diagnosed Mr. Kennedy with major depressive disorder but made no mention of PTSD, although the two conditions share many symptoms. The psychologist also stated that the Army lacked the resources to provide Mr. Kennedy with therapy to address his major depressive disorder and recommended that he be administratively discharged.

44. After receiving his diagnosis, Mr. Kennedy was ordered to meet once with a psychiatrist, who prescribed antidepressants and sleeping pills to alleviate his suicidal thoughts and other symptoms. He did not meet with any other mental health professionals or receive any other treatment in the two months between his diagnosis and his discharge.

45. Ignoring the clinicians' recommendations, Mr. Kennedy's Command Sergeant Major recommended he be transferred to a new company for a "fresh start." The Command Sergeant Major also canceled Mr. Kennedy's promotion orders and recommended he be demoted to Private First Class. His leadership offered him no treatment other than medication.

46. The Army had scheduled Mr. Kennedy's new unit to deploy to Iraq shortly after his reassignment. His mental health problems had not improved, and his new leadership gave him a choice: return to combat with his new unit, where adequate treatment would be unavailable, or accept a discharge and seek treatment for his mental health condition on his own.

47. Mr. Kennedy knew he urgently needed treatment, and he chose to be discharged so he could get the help he required. Because Mr. Kennedy had gone AWOL, his new commander opted to discharge him for the commission of a "serious offense" and lowered the characterization of his discharge to General. The Army discharged him on July 27, 2009.

48. Being a soldier was the center of Mr. Kennedy's identity throughout his service, and he gave everything he had to do the best job he could. He was proud of his service and his ability to excel in the Army.

49. Mr. Kennedy's General discharge status does not accurately reflect his exemplary performance in the Army, which is corroborated by his many service-related awards and contradicted by only one instance of poor judgment and disobeying orders—his briefly going AWOL to attend his own wedding—that was a direct result of his service-connected PTSD.

50. Likewise, Mr. Kennedy's reason for separation—"Misconduct (Serious Offense)"—does not accurately reflect the character of his service or the mitigating effect of the direct connection between his service-connected PTSD and his AWOL.

51. Leaving the Army with a judgment saying that his service was less than honorable caused Mr. Kennedy serious psychological damage at a time when he was already struggling with severe mental health issues. It has taken him years to come to terms with his General discharge, and he has begun discussing it outside of his family and close Army friends only recently.

52. As a result of his General discharge, Mr. Kennedy is ineligible for education benefits under the GI Bill, 38 U.S.C. §§ 3301–27. He paid for his first semester of college out of pocket.

53. While Mr. Kennedy was eventually able to access some VA vocational rehabilitation benefits to help pay for the rest of college, his General discharge reduced the amount of benefits available, forcing him to work full time while pursuing his degree. The difference between the VA benefits he received and the GI benefits he would have been eligible for with an Honorable discharge is approximately $75,000.

54. In addition, because of his discharge status, Mr. Kennedy was ineligible for state benefits such as property tax exemptions and many non-profit opportunities and scholarships that are open only to veterans with Honorable discharges.

55. After Mr. Kennedy's discharge, he continued to struggle with depression and was ultimately diagnosed with PTSD by both the VA and private clinicians.

56. VA clinicians described Mr. Kennedy as suffering from numerous PTSD symptoms, including depression, panic attacks in crowds, foreboding feelings and anxiety, sleep disturbances, and intrusive thoughts about incidents he experienced.

57. The VA rated him 50 percent disabled due to his service-connected PTSD.

58. Mr. Kennedy described to his treating therapist that he continues to deal with "intrusive thoughts" of the disfigured bodies of the people that he and his unit killed, as well as images of the faces and mangled bodies of insurgents who tried to kill his unit with suicide bombs.

59. According to Mr. Kennedy's treating therapist, he experiences survivor's guilt, which initially caused him to minimize and avoid his PTSD symptoms.

60. Mr. Kennedy has been in therapy for six years and continues to receive treatment for PTSD through the VA and private providers. He still struggles with hypervigilance, survivor's guilt, and depression. His survivor's guilt and depression are closely tied to his discharge status and the trauma of having his identity as a soldier abruptly stripped away.

61. Since receiving treatment, Mr. Kennedy has returned to demonstrating the character and excellence that defined much of his service in the Army.

62. In May 2012, Mr. Kennedy received a Bachelor of Science degree from the University of Massachusetts Boston, which he earned while working full time.

63. Following graduation, Mr. Kennedy began graduate work at a highly selective program in Biophysical Chemistry at New York University. He passed his qualifying exam with distinction and expects to earn his Ph.D. and publish two research papers in 2017.

64. Mr. Kennedy legally married his wife before his deployment in early 2007. Their wedding ceremony was performed in May 2009, and they have a daughter, born in 2013, and a son, born in 2016.

65. Mr. Kennedy first applied for a records review by the ADRB in November 2010. The Board rejected his application.

66. On February 18, 2015, Mr. Kennedy renewed his application, this time requesting a personal appearance.

67. Despite Mr. Kennedy presenting documentation to the Board of his diagnoses of PTSD from the VA, his treating therapist, and a psychologist, in October 2015, the Board denied his application again, concluding only that Mr. Kennedy was "diagnosed with a depressive disorder not otherwise specified." Ex. 2, ADRB Decision No. AR0150004987, Oct. 19, 2015 ("Kennedy ADRB Decision").

68. In its rejection of Mr. Kennedy's application, the ADRB did not mention or follow the binding instructions regarding PTSD cases issued in 2014 by then-Secretary of Defense Chuck Hagel. *See id.*; Ex. 1, Hagel Memo.

69. In fact, the ADRB cited no other past decisions to explain why it mentioned or applied the Hagel Memo in those cases but not in Mr. Kennedy's, nor did it distinguish Mr. Kennedy's case from other, similar cases where discharge upgrades were granted. Ex. 2, Kennedy ADRB Decision.

70. The ADRB decision also did not respond to several issues raised by Mr. Kennedy, including that his service was otherwise exemplary, that family and personal problems resulting from the denial of leave to attend his wedding affected his ability to serve satisfactorily, and that he was not properly diagnosed with PTSD by the Army in part because his survivor's guilt caused him to minimize and avoid his PTSD symptoms.

71. Additionally, the ADRB decision failed to explain why the Board considered the Army mental health evaluations more persuasive than the psychologist evaluation, therapist evaluation, and VA decision submitted by Mr. Kennedy, all of which established that he suffered

from PTSD at the time of the actions that led to his discharge and that his decision to go AWOL was a direct result of his PTSD and depression.

72. In rejecting Mr. Kennedy's discharge upgrade application without following the binding instructions of the Hagel Memo, the ADRB deprived Mr. Kennedy of any meaningful opportunity to refute his discharge status and reason for separation as inaccurate and therefore falsely stigmatizing characterizations of the nature of his service.

73. Despite its obligations under the Federal Records Act and the APA, the Defendant, in its Motion to Dismiss or Remand the original Complaint, has alleged that the Army has "misplaced" four of Mr. Kennedy's records, which it alleges "might be significant." Gov't's Mem. of Law in Support of Its Mot. to Dismiss, ECF No. 10-1, p. 19, 19 n.8; *see* 5 U.S.C § 552a(e)(5); 44 U.S.C. §§ 3101, 3301.

**Allegations as to Class Representative Alicia Carson**

74. Alicia Joy Carson was born in 1988 and grew up in Southington, Connecticut. She now lives in Anchorage, Alaska, where she studies natural sciences at the University of Alaska Anchorage.

75. Both Ms. Carson's grandmother and grandfather volunteered and became officers in the U.S. Army in WWII.

76. After high school, Ms. Carson studied environmental science at Naugatuck Valley Community College for two years.

77. Ms. Carson joined the National Guard, Fox Company, of the 186 Brigade Support Battalion ("BSB") in Southington, Connecticut, on December 25, 2008, when she was 20 years old. She felt she owed it to her grandparents and her country to serve.

78. Ms. Carson completed basic training in Ft. Jackson at the end of May 2009 and then attended Advanced Individual Training at Ft. Leonard Wood, Missouri.

79. Ms. Carson trained as a truck driver because she wanted to be deployed, and she knew that truck drivers were among the first group to be deployed.

80. Ms. Carson attended predeployment training at Camp Atterbury, Indiana, and then at Ft. Polk, Louisiana. During training, Ms. Carson outscored her entire battalion in convoy operations drills and convoy defense scenarios.

81. In early 2010, Ms. Carson was deployed to Afghanistan.

82. Ms. Carson's unit was responsible for transporting supplies to the entire battalion and regularly traveled to five different forward operating bases to deliver supplies.

83. She was serving as an Assistant Gunner when she experienced her first attack. She successfully defended the unit alongside her team, and as a result there were no fatalities.

84. Ms. Carson was an Assistant Gunner for only four or five months before she was promoted to the position of Gunner. In this position she was responsible for the safety and security of her vehicle and for providing backup support to the other four vehicles in her convoy.

85. Based on her performance, other units sought out Ms. Carson for their teams. When a Special Forces unit requested a female soldier for their team, Captain Kelleher recommended Ms. Carson for additional training with the unit in covert operations.

86. Ms. Carson was the only woman in her Special Forces unit.

87. As part of her Special Forces unit, Ms. Carson participated in direct contact with the enemy. In fewer than 300 days, Ms. Carson engaged in over 100 missions.

88. In late 2010, Ms. Carson returned from her nine-month deployment.

89. Upon her return, she informed Captain Kelleher that she was experiencing PTSD. Captain Kelleher referred her to a licensed professional counselor from the Department of Defense, Ms. Kathleen Saucier, for treatment.

90. Ms. Saucier spoke to Ms. Carson over the phone and referred Ms. Carson to services at the VA and the Hartford Vet Center.

91. Soon after, Ms. Carson missed a drill because of back pain incurred during her deployment. She provided a doctor's note and was excused for the absence.

92. Ms. Carson continued to report to weekend drills and even volunteered for extra duties such as recruitment and promotional trips despite her constant back pain.

93. During this time, Ms. Carson suffered from various severe PTSD-related symptoms, such as nightmares, loss of consciousness, loss of memory, trouble sleeping, irritability, and feelings of being dazed and confused.

94. In March 2012, a VA psychiatrist diagnosed Ms. Carson with PTSD and traumatic brain injury ("TBI").

95. At about the same time, Captain Peterson replaced Captain Kelleher as Ms. Carson's commanding officer.

96. Later in March 2012, Ms. Carson began experiencing photosensitivity, a serious vision problem widely recognized as a symptom of TBI.

97. Ms. Carson notified the Army that she was suffering from medical issues that affected her ability to perform her duties.

98. An optometrist determined that Ms. Carson suffered from "photosensitivity as a direct effect of PTSD and TBI."

99. On or around March 26, 2012, Ms. Carson notified the National Guard of her PTSD for a second time when she requested permission to wear sunglasses during drills.

100. Shortly after her request to wear sunglasses during drills, Ms. Carson called Captain Peterson and reported that she would not be able to attend her March 2012 drill.

101. The severe PTSD-related symptoms persisted, and Ms. Carson again called Captain Peterson to report that she would also not be able to attend her April 2012 drill.

102. On or around April 16, 2012, Ms. Carson faxed a medical note to her unit in Southington, Connecticut, excusing her from March, April, and May 2012 drills because she was being trialed on new medication.

103. In early May 2012, Ms. Carson received a message from Captain Peterson. She returned his call later that day, at which point Captain Peterson told her that it would be "in her best interest" to report to Camp Niantic that same day for a Post-Deployment Health Reassessment ("PDHRA").

104. When Ms. Carson went to put on her uniform to report to Camp Niantic as ordered, all she could do was sit and stare at it. She began experiencing a panic attack and realized she would not be able to leave the house.

105. Ms. Carson called Captain Peterson and notified him that she would not be able to make it to Camp Niantic.

106. On May 7, 2012, Ms. Carson received three notices of letters requiring her signature. Upon retrieving the letters, Ms. Carson was shocked to discover that she had been listed as AWOL for her March, April, and May 2012 drills, contrary to her belief that she had been medically excused.

107. Army procedures require that these notices be sent after each AWOL to give Ms. Carson an opportunity to correct any errors. Instead, the Connecticut National Guard composed and sent them all on the same day.

108. Ms. Carson called her Readiness NCO, Sergeant Dupris, and was told by phone that the National Guard had discharged her. Sergeant Dupris ordered her to turn in her uniform and equipment.

109. Over the next several months, Ms. Carson worked to correct the situation because she did not believe the discharge was appropriate due to her excused absences.

110. She contacted her unit Inspector General and Brigadier General Dan McHale to discuss her discharge.

111. On or about June 7, 2012, Ms. Carson spoke with Sergeant Dupris, Colonel Evon, and Brigadier General McHale at a round-table meeting. At the meeting, Ms. Carson was told that her discharge would be Honorable and that it would be reviewed as a possible medical discharge based on her service-related re-integration issues—specifically, her PTSD and TBI.

112. After the meeting, Ms. Carson attempted to contact the committee members several times. She left several emails and voice messages for the members and received no responses.

113. Ms. Carson called her unit for her discharge paperwork only to find out that she had received a General discharge with a reason for separation of “Unsatisfactory Participation.” The National Guard also sent her an $8,888.89 bill demanding she pay back her enlistment bonus and told Ms. Carson she would not be given access to the GI Bill and would be denied the honor of being buried in Arlington National Cemetery.

114. Ms. Carson obtained pro bono representation in 2015 to assist with her application to the ADRB for a discharge upgrade.

115. Ms. Carson submitted a paper application for a discharge upgrade in April 2015, seeking a discharge status of Honorable and a reason for separation of "Other designated physical or mental conditions."

116. The ADRB denied Ms. Carson's application for a discharge upgrade on October 2, 2015, without mentioning or applying the Hagel Memo's binding instructions. Ex. 3, ADRB Decision No. AR20150007237, Sept. 25, 2015 ("Carson ADRB Decision").

117. The ADRB did not cite any past decisions to explain why it referenced the Hagel Memo in those cases but not Ms. Carson's. Ex. 3, Carson ADRB Decision.

118. The ADRB decision stated, in part, that "[t]he fact the Veterans Administration [sic] has granted the applicant service connection for medical conditions the applicant suffered while on active duty does not support a conclusion that these conditions rendered the applicant unfit for further service at the time of her discharge processing." Ex. 3, Carson ADRB Decision.

119. The ADRB dismissed the contention that Ms. Carson's absences had been medically excused, denied that the late notices were procedural violations, and stated that "the applicant's record is void of the specific facts and circumstances concerning the events which led to her discharge" and that "[b]arring evidence to the contrary, the presumption of government regularity prevails as it appears that all the requirements of law and regulation were met." Ex. 3, Carson ADRB Decision.

120. Even though Ms. Carson had requested her full service records from the Army and National Guard prior to her application, the ADRB denied her application because of a lack of "specific facts and circumstances concerning the events surrounding her discharge," which

would have been contained in a "separation packet" that should have been available in Ms. Carson's official file and which the Army had an obligation to maintain.

**Allegations as to the Class Generally**

121. Since 2001, more than 2.5 million U.S. military personnel have served on active duty in Iraq and Afghanistan. Over half have been deployed more than once.

122. In that time, approximately thirteen percent of all service members have left the military with less-than-Honorable discharges.

123. These hundreds of thousands of veterans with less-than-Honorable discharges are generally ineligible for numerous benefits that their service has otherwise earned. If given a General discharge, veterans are categorically denied GI Bill education benefits and civil service retirement credits. Veterans who are discharged under Other-than-Honorable conditions are generally denied service-connected disability compensation, unemployment compensation, a military burial, benefits for surviving family members, and many other benefits.

124. Without these benefits, veterans are unable to access the health care they need, are forced to pay out of pocket for the educational benefits they seek, and are left largely without the support vital to ensuring a successful transition to civilian life.

125. Additionally, when veterans are discharged under less-than-Honorable conditions, the Army occasionally seeks to claw back or recoup their signing bonuses.

126. Furthermore, employers regularly request discharged service members' DD-214s, which include veterans' discharge statuses and reasons for separation, when evaluating them for possible employment.

127. A less-than-Honorable discharge imposes a stigma that casts doubt on a veteran's integrity and ability to perform as an employee.

128. Derogatory narrative reasons for separation can impose a similar or additional stigma on discharged veterans.

129. Many veterans who served on active duty and received less-than-Honorable discharges had developed PTSD and/or related mental health conditions during their service, were not diagnosed at the time, and were discharged for mental health-related misconduct.

130. Mental health issues and diagnoses have their own pervasive societal stigma, which is widely acknowledged and which often deters individuals from seeking the help they need. This stigma is no less acute within the military.

131. PTSD is a psychiatric disorder that can result from experiencing, witnessing, or confronting a traumatic event. Events that lead to PTSD are frequently life-threatening. PTSD is the most prevalent mental disorder arising from combat experience. Its symptoms include flashbacks or nightmares of the traumatic event; avoidance of anything associated with the trauma; and increased arousal, often manifesting in difficulty concentrating and irritability.

132. According to the VA, 11 percent of Afghanistan veterans and 20 percent of Iraq veterans suffer from PTSD. Among veterans of the Gulf War, 10 percent have PTSD, and for Vietnam veterans the number is 31 percent.

133. Investigations have revealed that between 2009 and 2015, the Army discharged 22,000 soldiers with less-than-Honorable characterizations for “misconduct” after they were diagnosed with mental health issues following their deployment to Iraq and Afghanistan.

134. The Army discharged under the same less-than-Honorable conditions many more veterans who had mental health issues, such as PTSD, that went undiagnosed.

135. Saddled with these stigmatizing discharges, along with their mental health conditions, nearly all of these veterans are unable to obtain the disability, educational, and other benefits to which their service otherwise entitles them.

136. The ADRB regularly exercises its power to upgrade the discharge status of a former service member. 10 U.S.C. § 1553(a) (2012); 32 C.F.R. § 70.9 (1978).

137. But in contrast to the equitable purpose for which the ADRB was established, for decades the military has systematically denied discharge upgrade applications involving evidence of PTSD attributable to military service.

138. In 2014, Vietnam veterans filed suit in this Court challenging the military's categorical refusal to seriously consider the effects of PTSD and related mental health conditions as related to service members' discharge statuses. *See Monk v. Mabus*, No. 3:14-cv-00260-WWE (D.Conn. filed Mar. 3, 2014). In that litigation, the plaintiffs exposed in great detail the serious misunderstandings of PTSD and other mental health issues that had been rampant in the military for decades as well as the consequences of less-than-Honorable discharges for misconduct related to undiagnosed PTSD.

139. Partially in response to the *Monk v. Mabus* litigation, in September 2014, then-Secretary of Defense Chuck Hagel issued binding instructions to military review boards specifying that the boards will give "special consideration" to PTSD diagnoses by the VA and "liberal consideration" to PTSD diagnoses by private medical practitioners. Ex. 1, Hagel Memo.

140. In late 2016, Congress amended 10 U.S.C. § 1553 to codify the Hagel Memo.

141. Since issuance of these binding instructions in 2014, the ADRB has recognized that the Hagel Memo applies to its adjudications.

142. In some decisions, the ADRB explicitly lists these guidelines as having been referenced.

143. However, in a sample of 200 ADRB decisions issued in 2015, randomly selected from all 368 decisions issued by the ADRB that year and published in the ADRB's online reading room, the ADRB cited the Hagel Memo in only 58 percent of cases involving allegations or indications of PTSD and in only 67 percent of cases involving allegations or indications of PTSD or a PTSD-related condition.

144. In the cases sampled, where the ADRB fails to cite the Hagel Memo despite allegations or indications of PTSD or PTSD-related conditions, the ADRB also does not cite past decisions to explain why it is citing the Hagel Memo in some but not all PTSD-related cases.

145. Even when the ADRB does list the Hagel Memo as a citation, the Board still frequently ignores the standards actually set out by the Hagel Memo. Not once in our sample of decisions did the Board explicitly use any of the language from the Hagel Memo (e.g., "liberal consideration," "special consideration") or otherwise indicate that they had applied "liberal" or "special" consideration to applicants' circumstances.

146. Thus, despite clear instruction from Secretary Hagel that the ADRB will apply a liberal standard to considerations of veterans' claims alleging PTSD or related conditions, in practice the ADRB follows these binding instructions only sporadically and unpredictably, and when it does purport to follow them it does so inadequately.

147. As a result, a large number of veterans with less-than-Honorable discharges and indicators of PTSD or related conditions who should receive discharge upgrades continue to fall through the cracks of the ADRB's inconsistent decision-making process. These veterans have had nowhere to turn within the military for an adequate assessment of how their PTSD affected

their service and their ultimate discharge, and they have had no consistent message regarding what claims they must bring to present their case.

148. The ADRB's failure to consistently follow its own policy not only denies class members the discharge upgrades they seek, but it also effectively forecloses their chances of obtaining the health, disability, and education benefits to which their service entitles them.

149. Additionally, the stigma attached to less-than-Honorable discharges limits class members' full participation in veteran communities and further isolates them from the support that they require. The ADRB's failure to adjudicate their claims consistent with agency guidelines ensures that this undeserved stigma will persist indefinitely.

150. Therefore, despite Secretary Hagel's attempt to address the decades-long crisis surrounding the military's treatment of veterans with less-than-Honorable discharges and PTSD or PTSD-related conditions, the military—including the Board that was created to serve as a backstop ensuring the "propriety and equity" of discharge statuses—continues to fail to sufficiently address the effect of PTSD on veterans' less-than-Honorable discharges.

151. Even after issuance of the Hagel Memo, the Army has wrongfully denied discharge upgrades to many veterans separated for PTSD-related misconduct. And despite the Hagel Memo and the 2016 amendments to 10 U.S.C. § 1553, there is substantial risk that veterans with less-than-Honorable discharges and symptoms of PTSD will be erroneously denied discharge upgrades by the ADRB in the future.

152. The ADRB's inconsistent application of the Hagel Memo constitutes a pattern and practice of arbitrary adjudication. Alternatively, the existence of any undisclosed policy instructing the ADRB as to when it should and should not apply the Hagel Memo to applications

by veterans alleging PTSD is a violation of applicants' due process rights under the U.S. Constitution.

153. Additionally, the ADRB has a pattern and practice of wrongfully denying applications when the Army itself has lost or misplaced records relating to those applications.

**The Proposed Class Definition**

154. This is a class action seeking equitable relief under Rule 23(b)(2) of the Federal Rules of Civil Procedure for violations of the Administrative Procedure Act and the Fifth Amendment.

155. The proposed class includes all Army, Army Reserve, and Army National Guard veterans of the Iraq and Afghanistan Era—defined as the period between October 7, 2001, and the present—who: (a) were discharged with less-than-Honorable discharges (this includes General and Other-than-Honorable discharges from the Army, Army Reserve, and Army National Guard); (b) have not received discharge upgrades to Honorable; and (c) have diagnoses of PTSD or PTSD-related conditions, or records documenting one or more symptoms of PTSD or PTSD-related conditions at the time of discharge, attributable to their military service under the Hagel Memo standards of liberal or special consideration.

**The Proposed Class Satisfies the Requirements of Rule 23**

156. The members of the proposed class are so numerous that joinder of all members is impracticable. In a sample of 200 ADRB decisions issued in 2015, randomly selected from all 368 decisions issued by the ADRB that year and published in their online reading room, 36.5 percent of applicants showed indications of PTSD or a related condition. In a similar sample from decisions issued in 2013, 21.3 percent of applicants showed such indications, for an overall rate of 29.0 percent.

157. Assuming representativeness of these samples, the present class therefore includes approximately 29.0 percent of approximately 180,000 Iraq and Afghanistan Era Army veterans with General or Other than Honorable discharges, for a total of approximately 52,000 veterans, as well as all veterans discharged under similar circumstances in the future.

158. The members' injuries derive from a unitary course of conduct by the centralized, hierarchical systems supervised and controlled by Defendant.

159. Many members of the proposed class suffer the serious physical and psychological consequences of long-term PTSD, as well as the long-term stigma associated with less-than-Honorable discharges.

160. There are questions of law and fact common to the proposed class, including, but not limited to,

a. whether Defendant, acting through the ADRB, has failed to apply consistent standards in the discharge upgrade review process when assessing how PTSD impacted class members' abilities to perform their duties, in violation of the Fifth Amendment and the Administrative Procedure Act;

b. whether Defendant has abused his discretion and acted arbitrarily and capriciously, in a manner unauthorized by law, by refusing to give appropriate consideration to class members' allegations that their misconduct was the result of PTSD, and therefore failing to upgrade class members' discharge statuses, in violation of the Administrative Procedure Act; and

c. whether the class members have, as a result of improperly considered PTSD, impermissibly suffered the stigmatizing effects of less-than-Honorable discharges that Defendant has refused to upgrade.

161. The claims of the individual Plaintiffs are typical of the claims of the proposed class members.

162. Plaintiffs and their counsel will fairly and adequately protect the interests of the proposed class.

163. Defendant, by failing to properly apply the Hagel Memo in a consistent manner to the circumstances of class members, has acted or refused to act on grounds that apply generally to the class, and therefore final injunctive relief and/or corresponding declaratory relief is appropriate respecting the class as a whole.

## LEGAL CLAIMS OF THE CLASS

### Claim I

### Violations of the Administrative Procedure Act

164. Mr. Kennedy and Ms. Carson ("Individual Plaintiffs"), on behalf of themselves and members of the proposed class, reallege and incorporate herein by reference as though fully set forth each and every allegation contained in Paragraphs 1 through 163 of this Complaint.

165. Where the rights of individuals are concerned, agencies are required to comply with their own internal rules and informal procedures.

166. By refusing to properly consider PTSD and related conditions and to consistently apply the relevant binding instructions, such as the Hagel Memo, in reviewing Plaintiffs' and other class members' discharge statuses upon their application, Defendant and the Board through which Defendant operates have engaged in arbitrary and capricious actions against those with PTSD attributable to military service and have made decisions unsupported by substantial evidence and contrary to law.

167. This refusal and failure to consistently apply the Hagel Memo stigmatizes class members, interferes with their employment prospects, and bars them from the VA benefits they earned and deserve and to which they would otherwise be entitled.

168. Defendant frequently and unlawfully fails to maintain records that it professes are important to the resolution of applicants' cases. 5 U.S.C. § 552a(e)(5).

169. Defendant's foregoing conduct violates the Administrative Procedure Act.

**Claim II**

**Violation of the Fifth Amendment to the United States Constitution**

170. Individual Plaintiffs, on behalf of themselves and members of the proposed class, reallege and incorporate herein by reference as though fully set forth each and every allegation contained in Paragraphs 1 through 163 of this Complaint.

171. The protections of the Due Process Clause of the Fifth Amendment of the U.S. Constitution require that an administrative agency provide notice and an opportunity to be heard when interfering with a liberty or property interest and that it conduct adjudications in a fair and orderly manner.

172. Defendant, acting in his official capacity, has refused to employ consistent standards in assessing the impact of Individual Plaintiffs' and other class members' PTSD attributable to their service on their discharge upgrade applications.

173. The due process protections of the Fifth Amendment also require that federal administrative agencies follow their own regulations and sub-regulatory guidance in conducting their adjudications.

174. Defendant, acting in his official capacity, and the ADRB, through which Defendant operates, have failed to apply their own internal binding rules and procedures,

including the Hagel Memo and DoD Instruction 1332.28 to address all of the issues raised, in reviewing Individual Plaintiffs' and other class members' discharge statuses upon their applications.

175. This has resulted in Defendant's haphazard and baseless denials of discharge upgrade applications, or, in the alternative, denials on the basis of a policy not disclosed and therefore against which Plaintiffs were not given a meaningful opportunity to defend themselves. In either case, there is a high and pervasive risk that veterans with less-than-Honorable discharges and symptoms of PTSD will suffer permanent damage to their reputation due to inaccurate, falsely stigmatizing characterizations of their service.

176. In addition to stigmatizing class members, these denials interfere with their employment prospects by disqualifying them for veterans-preference hiring and bar them from the VA benefits they earned and deserve and to which they are otherwise entitled.

177. Defendant frequently and unlawfully fails to maintain records important to the adjudication of individuals' claims concerning property and liberty interests, denying them a meaningful opportunity to be heard and judicial review of its decisions.

178. Defendant and the ADRB through which Defendant operates have unconstitutionally infringed upon Plaintiffs' property and liberty rights, protected by the Due Process Clause of the Fifth Amendment.

179. The Defendant's foregoing conduct violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

## LEGAL CLAIMS OF INDIVIDUAL PLAINTIFFS

### Claim III

### Administrative Procedure Act

180. Individual Plaintiffs reallege and incorporate herein by reference as though fully set forth each and every allegation contained in Paragraphs 1 through 163 of this Complaint.

181. Defendant's denial of Individual Plaintiffs' applications for discharge upgrades is a final agency action that is arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because Defendant failed to give "special consideration" to the VA diagnoses of Individual Plaintiffs and to give "liberal consideration" to Mr. Kennedy's diagnoses by private practitioners, all as directed by the Hagel Memo.

182. Defendant failed to consider important evidence that demonstrated that Individual Plaintiffs' PTSD existed at the time of their discharges and that their PTSD mitigated the misconduct that led to their discharges.

183. Defendant failed to consider important evidence that demonstrated that Ms. Carson's PTSD existed at the time of her discharge, that she was medically excused from drill because of her PTSD, and that her PTSD mitigated the misconduct that led to her discharge.

184. Defendant failed to follow its own rules by not applying the Hagel Memo to the applications of Individual Plaintiffs.

185. Defendant failed to follow its own rules by not responding to all the issues raised in Individual Plaintiffs' discharge upgrade applications.

186. Defendant unlawfully failed to maintain records that it professes are important to the resolution of Individual Plaintiffs' cases. 5 U.S.C. § 552a(e)(5).

187. Defendant failed to provide a decision demonstrating a rational connection between the evidence presented and the facts found, which makes the ADRB decisions on the

applications of Individual Plaintiffs arbitrary, capricious, and an abuse of discretion, in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

**Claim IV**

**Fifth Amendment to the U.S. Constitution**

188. Individual Plaintiffs reallege and incorporate herein by reference as though fully set forth each and every allegation contained in Paragraphs 1 through 163 of this Complaint.

189. The Due Process Clause of the Fifth Amendment to the U.S. Constitution requires that administrative agencies provide notice and an opportunity to be heard when interfering with an individual's liberty or property interest.

190. When false stigma and reputational damage are involved, the "opportunity to be heard" involves an opportunity to refute the charges.

191. Defendant did not provide Individual Plaintiffs with notice or a meaningful opportunity to be heard because the ADRB either negligently failed to apply its own binding instructions (i.e., the Hagel Memo) or, in the alternative, followed undisclosed internal policy in choosing not to follow its own instructions in their cases, depriving Individual Plaintiffs of the chance to account for the role of their PTSD in their misconduct. This has caused continuing stigma for Individual Plaintiffs and barred them from the VA benefits they earned and to which they are otherwise entitled.

192. The due process protections of the Fifth Amendment to the U.S. Constitution require that federal administrative agencies conduct adjudications in a fair and orderly manner.

193. Defendant did not conduct fair adjudications of Individual Plaintiffs' discharge upgrade applications because the ADRB failed to apply the Hagel Memo to their claims.

194. Defendant also failed to conduct fair adjudications of Individual Plaintiffs' discharge upgrade applications because the ADRB failed to provide them with a decisional document articulating the reasons for the denial of their applications based on the evidence presented.

195. The due process protections of the Fifth Amendment also require that federal administrative agencies follow their own regulations and sub-regulatory guidance in conducting their adjudications.

196. Defendant failed to follow its own rules by failing to apply the Hagel Memo to Individual Plaintiffs' applications.

197. Defendant failed to follow its own rules by not responding to all the issues raised in Individual Plaintiffs' applications.

198. Defendant failed to maintain records important to the adjudication of Individual Plaintiffs' claims concerning their property and liberty interests, denying them a meaningful opportunity to be heard and judicial review of its decisions.

199. Defendant also failed to follow its own rules by not explaining why it considered the Army's determination that Mr. Kennedy did not suffer from PTSD more persuasive than the submitted evidence that Mr. Kennedy did suffer from PTSD.

200. Defendant's decision deprived Ms. Carson of property in that it failed to correct her improper discharge, and thus she is still being billed for her enlistment bonus, which she earned through her exemplary service.

201. The Defendant's foregoing conduct violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

**Claim V**

**Little Tucker Act**

202. Individual Plaintiffs reallege and incorporate herein by reference as though fully set forth each and every allegation contained in Paragraphs 1 through 163 of this Complaint.

203. Claims for military pay and allowances under $10,000 are actionable under the Little Tucker Act, 28 U.S.C § 1346(a)(2).

204. Under 37 U.S.C. § 303(a) and 37 U.S.C. § 308, the Secretary may not recoup an enlistment bonus unless the service member fails to satisfy eligibility requirements.

205. Defendant's letters claim that they are recouping the bonus because Ms. Carson "has failed two consecutive [Army Physical Fitness Tests] during the contractual agreement and has unsatisfactory participation per AR 135-91."

206. Ms. Carson did not exhibit unsatisfactory participation per AR 135-91 because her absences should have been considered medically excused due to her doctor's notes for her PTSD and TBI.

207. Defendant's attempted recoupment of $8,888.89 of Ms. Carson's enlistment bonus therefore violates its statutory obligation to pay her and constitutes an illegal exaction.

208. Defendant's failure to correct Ms. Carson's discharge status to reflect her honorable service and to recognize her PTSD as a mitigating factor in her misconduct does not justify Defendant's attempted recoupment.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs respectfully request that the Court:

(1) Grant all appropriate and equitable relief to address past injury and to restrain future injury of Plaintiffs and members of the proposed class by Defendant;

(2) Direct, by issuance of an injunction, measures sufficient to ensure that Defendant employs consistent standards in considering the effects of class members' PTSD when determining whether to upgrade their discharge statuses;

(3) Direct, by issuance of injunction, that the discharge statuses of Individual Plaintiffs be upgraded to Honorable and that the Army be prevented from recouping any part of Ms. Carson's enlistment bonus;

(4) Award attorneys' fees and costs to Plaintiffs; and

(5) Grant any other and further relief that the Court deems just and proper.

Dated: April 17, 2017
New Haven, Connecticut

Respectfully submitted,

By: /s/ Michael J. Wishnie

Margaret Kuzma, Supervising Attorney†
Connecticut Veterans Legal Center
114 Boston Post Rd.
West Haven, CT 06516
Tel: (203) 794-4291
mkuzma@c
tveteranslegal.org

Mario Gazzola, Law Student Intern*
Jordan R. Goldberg, Law Student Intern*
Catherine E. McCarthy, Law Student Intern*
Jonathan Petkun, Law Student Intern*
Helen E. White, Law Student Intern*
Aaron Wenzloff, Supervising Attorney, ct28616
Michael J. Wishnie, Supervising Attorney, ct27221
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
michael.wishnie@ylsclinics.org

*Counsel for Plaintiffs*

† Motion for admission to the District of Connecticut forthcoming.
* Motion for law student intern appearance forthcoming.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2017, a copy of the foregoing Amended Complaint was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ Michael J. Wishnie
Michael J. Wishnie, ct27221
P.O. Box 209090
New Haven, CT 06520-9090
Tel.: (203) 432-4800
Fax: (203) 432-1426
michael.wishnie@ylsclinics.org